# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **DEJENAY BECKWITH** | § | |
| **on her Own Behalf and** | § | |
| **Others Similarly Situated** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:17-cv-2859** |
| | § | |
| _____ | § | |
| **CITY OF HOUSTON, TEXAS,** | § | |
| **Mayor Sylvester Turner, Police** | § | |
| **Chief Art Acevedo, Houston** | § | |
| **Forensic Science Center, Peter** | § | |
| **Stout,** | § | |
| | § | |
| **And Former Mayors of the** | § | |
| **City of Houston** | § | |
| **in their individual capacities:** | § | |
| **Annise Parker,** | § | |
| **Bill White,** | § | |
| **Lee P. Brown,** | § | |
| **Bob Lanier (deceased), and** | § | |
| **Kathy Whitmire.** | § | |
| | § | |
| **And Former Police Chiefs of the** | § | |
| **City of Houston** | § | |
| **in their individual capacities:** | § | |
| **Charles McClelland,** | § | |
| **Harold Hurtt,** | § | |
| **Clarence Bradford,** | § | |
| **Sam Nuchia,** | § | |
| **Elizabeth Watson,** | § | |
| **Lee P. Brown.** | § | |
| | § | |
| **Defendants.** | § | **_Jury Trial Requested_** |

1

## ORIGINAL CLASS ACTION COMPLAINT

TO THE HONORABLE JUDGE OF THIS COURT:

NOW COMES, Plaintiff, DEJENAY BECKWITH, who on her own behalf and on behalf of others similarly situated (hereinafter, collectively "Plaintiffs"), file this, Original Class Action Complaint against the CITY OF HOUSTON, TEXAS, Mayor Sylvester Turner, Police Chief Art Acevedo, the Houston Forensic Science Center, Peter Stout, CEO of the Houston Forensic Science Center as well as Former Mayors of the City of Houston: Annise Parker, Bill White, Lee P. Brown, Bob Lanier (deceased), and Kathy Whitmire in addition to Former Police Chiefs of the City of Houston: Charles McClelland, Harold Hurtt, Clarence Bradford, Sam Nuchia, Elizabeth Watson and Lee P. Brown, (hereinafter, "Defendants") and respectfully allege the following:

## I.

## <u>INTRODUCTION</u>

This lawsuit seeks to address an appalling violation of the law: the persistent and intentional failure to test thousands of Sexual Assault Evidence Kits (so called "Rape Kits" or "SAKS") and thus the failure to prevent the sexual assault of

hundreds of women and juveniles, by identifiable assailants, including serial rapists. The lawsuit further addresses the invasive collection of the SAKS and the negligent failure to process the SAKS. The case seeks compensation for a violation of plaintiffs' civil rights and the local government's deliberate indifference to the civil and constitutional rights of women and children who were the victims of sexual assault. This case seeks to bring the City of Houston, Texas, and Harris County into compliance with its federal obligation and cause it to act in a manner that does not violate the rights of its citizens.

## II.

## NATURE OF ACTION

1. Plaintiff and the Putative Class Members are female and juvenile individuals who reported sexual assaults to the Houston Police Department, were directed by the Houston Police Department to have bodily fluid samples removed from their bodies and placed within rape kits, and whose SAKS were subsequently transported to the Houston Police Department Crime Lab, subsequently reorganized as the Houston Forensic Science Center, for testing, evidentiary and custodial purposes.

2. Defendants' failure to submit or test over 6,600 such SAKS for DNA and other testing causing the spoliation of many SAKS and it resulted in damages to the

plaintiffs because of their subsequent rape by identifiable perpetrators, or other violations of their rights, which constitute a violation of the due process, equal protection and unreasonable search and seizure clauses of the Texas and United States Constitutions ("Constitutions") as well as State Law. Alternatively, defendants acted with deliberate indifference to the civil and constitutional rights of the plaintiffs.

3. The failure to test or even submit SAKS for testing was part of Defendants custom and practice not to investigate sexual assaults against women and juveniles generally – a custom or practice which was overseen by the Individual Defendants.

4. Accordingly, Plaintiffs now bring this action seeking damages for violation of civil rights under color of law, injunctive relief requiring Defendants to change the methods used to investigate sexual assault and for the award of attorney fees and cost.

## III.

## PARTIES

5. Putative Class Representative DEJENAY BECKWITH ("Plaintiff") is an adult female resident citizen of Milam County, Texas, formerly a female resident citizen of Harris County, Texas.

6. Defendant City of Houston, Texas ("Defendant" and/or "Houston"), is a

municipal entity, located in Harris County, Texas, recognized by the State of Texas as a properly organized and legal municipal entity, operates the Houston Police Department, its Crime Lab, and the Houston Forensic Center and can be served with process by serving the City Secretary, at 900 Bagby, Houston, Texas 77002.

7. At all relevant times, Houston's employees were duly appointed as the Chief of Police for the Houston Police Department, the Mayor of the City of Houston, the directors of the Houston Crime Lab or the Director of the Houston Forensic Center ("The Individual Defendants"). The Chiefs of Police, Mayors and Crime Lab Directors were employees of the defendant from the time the police had the first rape kit that would have caught Beckwith's rapist to the day she was sexually assaulted.

8. The Individual Defendants, together with their predecessors, are responsible for establishing policy, implementing and overseeing City of Houston policies, practice, and custom of failing to investigate rapes against females and/or were responsible for overseeing and training others to continue those violative policies, practices and/or customs. They were policymakers who are individually liable for violations of plaintiff's civil rights and include Mayor Sylvester Turner, Art Acevedo, Chief of Police for the City of Houston and, the Houston Forensic Science Center and Peter Stout, CEO of the Houston Forensic Science Center as well

as Former Mayors of the City of Houston: Annise Parker, Bill White, Lee P. Brown, Bob Lanier (deceased), and Kathy Whitmire in addition to Former Police Chiefs of the City of Houston: Charles McClelland, Harold Hurtt, Clarence Bradford, Sam Nuchia, Elizabeth Watson and Lee P. Brown.

9. The putative subclasses of similarly situated Plaintiffs ("Putative Class Members") consist of the following:

**A. ALL WOMEN AND CHILDREN WHO WERE SEXUALLY ASSAULTED IN HOUSTON, HARRIS COUNTY, TEXAS, AS THE RESULT OF AN OFFENDER NOT BEING PREVIOUSLY IDENTIFIED DUE TO THE RAPE KIT (SEXUAL ASSAULT EVIDENCE KIT) OF A PRIOR VICTIM NOT BEING SUBMITTED FOR TIMELY TESTING BY THE CITY OF HOUSTON, HARRIS COUNTY, TEXAS.**

**B. ALL WOMEN AND CHILDREN WHO WERE SEXUALLY ASSAULTED IN HOUSTON, HARRIS COUNTY, TEXAS, AND UNDERWENT INVASIVE TESTING IN THE PREPARATION OF A RAPE KIT (SEXUAL ASSAULT EVIDENCE KIT), BUT WHOSE RAPE KIT WAS NOT SUBMITTED FOR TESTING BY THE CITY OF HOUSTON, HARRIS COUNTY, TEXAS IN A TIMELY MANNER.**

**IV.**

**JURISDICTION AND VENUE**

10. The jurisdiction of this lawsuit is proper in the United States District Court for the Southern District of Texas – Houston Division pursuant to 28 U.S.C. §1331

and 1343 and supplemental jurisdiction pursuant to 28 U.S.C. §1367.

11. Venue is proper in the Houston Division of the Southern District of Texas as the events giving rise to the cause of action in this lawsuit occurred within the Southern District of Texas and within the parameters of the Houston Division. Therefore, venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391.

12. Venue is proper for the Individual Defendants pursuant to 28 U.S.C. 1391 because Individual Defendants committed violations under color of law, acts or omissions in this district of the United States District Court.

13. This action is brought pursuant to 42 U.S.C. §1983, 1985, 1986, and 1988, and various other state laws and common law.

## V.

## CLASS ACTION STATUS IS APPROPRIATE

14. Pursuant to Fed.R.Civ.P. Rule 23(a) and 23(b)(1) and (2), Class Representative Plaintiff DeJenay Beckwith brings this class action on her behalf and on behalf of other similarly situated sexually assaulted women and children in City of Houston, Harris County, Texas ("the Class").

15. The exact number of members in the Class identified in the preceding paragraph is not presently known, but upon information and belief, the Class includes over six thousand (6,000) women and several hundred children, and is

therefore so numerous that pursuant to Fed. R. Civ. P. 23(a)(1) joinder of individual members in this action is impracticable. All Putative Class Members are known to the defendants and in fact defendants are in possession of intimate details about each putative class member.

16. There are common questions of law and fact in the action that relate to and affect the rights of each member of the Class. The relief sought is common to the entire Class, as all Putative Class Members were exposed to the same type of conduct by the Defendant and experienced the same due process, equal protection, 4th Amendment and statutory violations by the Defendants. Accordingly, pursuant to Fed. R. Civ. P. 23(a)(2), there are questions of law and fact common to the Class.

17. The claims of the Class Representative are typical of the Class she represents as the Class Representative claims that Houston, violated the rights held by the Putative Class Members under the Fourteenth Amendment to the United States Constitution, Texas Constitution, 42 U.S.C. §1983, 42 U.S.C. §1986, and pending state law. There is no conflict between the putative Class Representative and any other members of the Class with respect to this action.

18. DeJenay Beckwith is an adequate representative of the Class because her interests do not conflict with the interests of the Class that she seeks to represent and she intends to prosecute this action vigorously. Accordingly, pursuant to fed. R. Civ.

8

P. 23(a)(4), the Class representative will fairly and adequately protect the interests of the Class.

19. This action is properly maintained as a class action in that the prosecution of separate actions by individual Putative Class Members would create a risk of different adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not party to the adjudication, or would substantially impair or impede their ability to protect their interests, or would establish incompatible standards of conduct for the City of Houston.

20. This action is properly maintainable under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) because Houston, has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole and because questions of law and fact predominate over questions affecting individual members and a class action is superior to other available methods for the fair and efficient adjudication of this case.

21. The questions of law or fact common to the Class and which predominate over any other questions affecting individual Putative Class Members, include without limitation:

a. Whether the Houston, had a custom, policy and practice of failing to submit SAKS for testing;

b. Whether the Houston's custom, policy and practice with respect to its treatment of SAKS violated constitutionally protected rights of the Class under 42 U.S.C. § 1983 and the due process clause with respect to their liberty and property interests;

c. Whether the Houston's custom, policy and practice with respect to its treatment of SAKS violated constitutionally protected rights of the Class under 42 U.S.C. § 1983 and the equal protection clause by treating sexual assault reports from women with less priority than other crimes not involving women or domestic violence;

d. Whether the Defendants failed to properly train their employees or correct their abuses including failure to restrict, discipline and control employees in order to present loss, destructions or damage to SAKS.

e. Whether Houston's treatment of female and juvenile rape victims and sexual assault kits was consistent with ordinary and reasonable law enforcement practices or whether such treatment was reckless, deliberate and/or intentional; and,

     f.   Whether Houston's treatment of female and juvenile rape victims and the sexual assault kits they submitted was deliberately indifferent to the civil and constitutional rights of plaintiffs.

22. This action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individual litigation would increase the delay and expense to all parties and the court system, would create the potential for inconsistent or contradictory judgments and would possibly impair or impede the ability of individual Putative Class Members to protect their interests. The class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale and comprehensive supervision by a single court.

23. The attorneys for the Class representative are experienced and capable in the field of constitutional law and class action litigation and have been recognized as knowledgeable, capable counsel who have carried out their duties.

## VI.

## FACTS PERTAINING TO THE UNFAIR
## TREATMENT OF DEJENAY BECKWITH

24. On April 2, 2011, DeJenay Beckwith was returning home from her cousin's house to try and find an inexpensive car mechanic as her car had recently broken down. Ms. Beckwith had been working at AT&T and needed her car for transportation. A man later identified as David Lee Cooper then circled around in his vehicle and offered to give her a ride, but she said no. She did mention that her car was broken. David Lee Cooper then said he was a mechanic. Ms. Beckwith could see his hands were oily indicating he might be a mechanic.

25. Ms. Beckwith made small talk about cars with David Lee Cooper and was eventually convinced David Lee Cooper was a mechanic and could help her fix the car she desperately needed. Ms. Beckwith and David Lee Cooper then drove to her car at her apartment complex. After he thoroughly inspected her car he said a new motor was needed. He then asked for a drink of water. They entered Ms. Beckwith's apartment to get the water. They discussed the car work some more.

26. At some point, David Lee Cooper turned violent and threw Ms. Beckwith to the floor and repeatedly struck her, bit her several times, and raped her.

27. At one point during the ordeal, Ms. Beckwith seized an opportunity to escape and ran out of the apartment. David Lee Cooper chased her but luckily Ms. Beckwith ran into a male friend who helped her and gave chase to David Lee Cooper. David Lee Cooper ran to his vehicle and fled.

28. Ms. Beckwith immediately called HPD and they came out along with Houston EMS. Ms. Beckwith's relative took Ms. Beckwith to Memorial Hermann Southwest Hospital where a SAKS rape kit was done. The hospital gave Ms. Beckwith anti-STD drugs but informed Ms. Beckwith it was not 100% effective.

29. A police officer from the Houston Police Department then transported the SAKS to the Houston Police Department ostensibly for testing and to be used as evidence in the investigation of the sexual assault and rape.

30. Over the next five (5) years, Defendant City of Houston never submitted DeJenay Beckwith's SAKS for testing.

31. HPD detective called and asked why Ms. Beckwith "was on Bissonnet" implying she was a prostitute. The HPD detective made it seem the rape was her fault and discouraged Ms. Beckwith from filing a report as it was unlikely the suspect would be caught. The HPD detective never showed up at Ms. Beckwith's residence or requested that he meet Ms. Beckwith. The detective said, "these things happen

to these types of women." This was the last time Ms. Beckwith heard from HPD for many years.

32. HPD contacted Ms. Beckwith said they had a suspect in the sexual assault. Beckwith phoned HPD several months later to talk about the sexual assault but HPD did not call back.

33. Ms. Beckwith next saw HPD in 2016 and they informed Ms. Beckwith they had a suspect and his name was David Lee Cooper. Furthermore, Ms. Beckwith then learned of the existence of other rape victims of David Lee Cooper, but did not receive any names.

34. In later 2016, DeJenay Beckwith was finally contacted by the Harris County District Attorney's Office because her 2011 Rape Kit had finally been tested and had matched to the DNA of David Lee Cooper.

35. David Lee Cooper, the man who sexually assaulted and raped DeJenay Beckwith, had a long history of assaulting women, including a minor child in 2002, before raping DeJenay Beckwith. Along with his sexual assault convictions, David Lee Cooper had prior Misdemeanor Theft, DWI, Burglary of a Habitation and Attempted Kidnapping convictions.

36. In 1991, David Lee Cooper was accused of rape, but the case was dismissed. In 1994, David Lee Cooper was found not guilty in a separate rape case

14

by a jury.  The 1994 rape case facts bear an extremely similar fact pattern to DeJenay Beckwith's sexual assault and rape in 2011 as well as the facts of a 2005 attempted kidnapping of another victim.  David Lee Cooper also committed a sexual assault and rape in 2009.

37. David Lee Cooper's DNA had been included in the Combined DNA Index System ("CODIS") since 1991.

38. DeJenay Beckwith relied upon Houston's intentional and false representations regarding the genetic evidence she submitted.  Had Houston, entered any of the David Lee Cooper victims' genetic evidence, David Lee Cooper would have been stopped before he had the chance to sexually assault and rape DeJenay Beckwith.

39. Prior to DeJenay Beckwith's sexual assault on April 2, 2011, David Lee Cooper sexually assaulted other females including members of the proposed Class.

40. David Lee Cooper is a serial rapist who could have been stopped in 1991, 1994, 2002, 2005 and in 2009 before he sexually assaulted and raped DeJenay Beckwith.

41. On December 14, 2016, David Lee Cooper pleaded guilty to a 2002 sexual assault of a child, a 2009 sexual assault and the 2011 sexual assault of DeJenay Beckwith.

42. Upon information and belief, the event that triggered the three guilty pleas for Sexual Assault, including sexual assault of a child by David Lee Cooper, was that the SAKS were finally tested and the evidence turned over to the Harris County District Attorney's Office.

## VII.

## BACKGROUND ON SEXUAL ASSAULT KITS

43. A complete DNA profile can help accurately discriminate between different people.  No two individuals can have the same exact DNA profile except for monozygotic twins.  Once the DNA profile has been extracted, it can be compared to the DNA profiles of any suspect to look for a match.  In cases where no match is found, investigators and police might run a search in a DNA database. These databases will contain the DNA profiles of convicted criminals.

44. A SAKS kit is normally used by forensic experts to collect samples from the body of the victim.  The kit, usually contains slides, swabs, white sheets, plastic bags and other items which can be used to store, analyze or preserve samples of semen, body fluids or hairs. The kits used are the essential tools provided to the victim and are used to collect whatever forensic biological evidence that may have been left by the perpetrator. The forensic samples collected, meaning the semen, saliva, skin or other biological material, are provided to a laboratory, which can then

16

administer a full DNA analysis, but only if the defendants send it to the lab.

45. Sexual assault kit testing can also identify perpetrators and help to build stronger cases against known suspects. Offenders who are not known at the time of the initial investigation can be identified through the Combined DNA Index System "CODIS". CODIS stores the DNA profiles of offenders. When DNA profiles that are foreign to victims and developed from evidence testing match a profile in the system, this provides evidence which identifies the perpetrator.

46. Through CODIS, DNA evidence has the potential to positively impact criminal investigations, and prevent future crimes. Defendants need only have the kits tested and assign the manpower to both solve crimes and prevent future crimes.

47. As of May 2009, the federal Violence Against Women Act of 2005 went into effect, requiring state governments that wish to continue receiving federal funding to pay for "Jane Doe rape kits" or "anonymous rape tests". These tests allow victims too traumatized to go to the police to undergo the procedure at hospitals. The hospitals maintain the collected evidence in a sealed envelope identified only by a number, unless police access its contents upon the victim's decision to press charges.

48. The process of collecting a rape kit is highly invasive, time-consuming and time sensitive. The physical examination begins with the victim disrobing while

17

standing on a large sheet of paper, which collects any trace evidence that may fall from the victim's body or clothes. Examiners then collect biological samples of semen, blood, saliva and other bodily fluids by swabbing the victim's genitals, rectum, mouth and body surfaces. Examiners also collect fingernail scrapings and pluck head and pubic hairs. If the victim consents, the examiner will also take photographs of genital injuries using a scope.

49. In addition to facilitating the collection of biological samples and injuries, the kit guides the documentation of the victim's medical history, emotional state, and account of the assault. The entire process of collecting the rape kit takes between two and one half to five hours to complete.

50. In sexual assault cases in which the perpetrator is a stranger, rape kits may be instrumental in identifying the assailant through the DNA profiling, which research suggests may help lead to an arrest. For example, a 2009 study examining sexual assault cases from two of 389 crime laboratories in the United States found that stranger-rape cases with forensic evidence were 24 times more likely to produce an arrest than stranger-rape cases without forensic evidence.

51. The vast majority of sexual assaults are non-stranger (or "acquaintance") cases where the victim knows the assailant. The kits' forensic evidence can be used to confirm offender identity in acquaintance-rape cases. The kits may also be used

to determine whether the offender committed other crimes. SAKS also documents the victim's injuries, (e.g., photographs of bruising), as a useful tool to corroborate allegations of nonconsensual sexual contact. Even where expired criminal statutes of limitations exist, CODIS-hit information may be used in alternative ways (i.e., other than to bring charges against the offender in the current case). For example, the results can be communicated to prevent future crimes, to identify possible suspects in future crimes, to prevent parole grants, and even in the Texas Department of Corrections for trustee assignments and to prevent inmate crime.

52. Serial rape is defined as a circumstance in which multiple rapes or sexual assaults occur at the hands of a single assailant, like David Lee Cooper. Serial rape may involve sexual partner violence or non-partner sexual violence, and it may be in the same family, in the same or different regions of a city, or in different cities or states. In both stranger and non-stranger sexual assault cases, DNA testing of rape kit evidence and DNA database hits help identify serial rapes.

## VIII.

## BACKGROUND ON UNTESTED SAKS IN HOUSTON

53. Art Acevedo succeed Charles McClelland, who succeeded former Police Chief Harold Hutt, who served HPD between 2004 and 2009. In June 2009, HPD opened a $13 million state-of-the art property storage facility. Later the next year,

HPD determined there were approximately 16,000 SAKs in the storage facility. A sampling of the SAKs in cold storage showed that approximately 4,220 kits had not been tested by a crime lab.

54. As a result of the crime lab debacle, the City of Houston organized the Houston Forensic Science Center. HFSC is managed by a Director, a CEO, and a Board of Directors that is appointed by the Houston City Council and Mayor.

55. Sexual assault reports made to HPD prior to April 2014 were routed to one of two specialized investigative units. In 2011, cases involving victims aged 16 and under were routed to the "juvenile" investigative unit and cases involving victims aged 17 and older were routed to the "adult" investigative unit. The units were under the direction of different captains in different HPD divisions and the units were physically located in different buildings. Both units reported that they adopted a practice, in 2006, of submitting all SAKS for testing.

56. In 2011, the National Institute of Justice funded the Houston Department to form a multidisciplinary team to study the problem of sexual assault kits (SAKs) that were collected but never submitted to a crime lab for screening and testing.

57. Sometime in 2013, the City of Houston devoted $2.2 million to test all untested rape kits, but together with the HFSC, the City and the individual named defendants decided to test only a fraction of these kits.

58. The juvenile unit receives a substantially greater number of reports than the adult unit each year.

## IX.

## ALLEGATIONS AGAINST THE CITY OF HOUSTON

59. DeJenay Beckwith repeats, realleges, and incorporates herein each of the preceding and following paragraphs as if fully set forth herein.

60. THouston has reported that it has completed testing of 6,663 previously untested SAKS.  Upon information and belief that some of the backlog of untested SAKS was as much as 30 years old.

61. Although DeJenay Beckwith was informed by the Harris County District Attorneys' Office in late 2016 that her SAKS had been tested and there was a match to David Lee Cooper, Putative Class Members have never been informed that their rape kits have not been tested and that instead they were simply warehoused.

62. Based upon publicly available reports Defendants have maintained a practice of not submitting SAKS for testing, not reviewing test results, and failing to preserve evidence.

63. These pervasive practices were well known to Houston and Individual Defendants who perpetuated, ratified, tolerated and continued such practices and deficiencies.

21

64. Houston Mayor Kathy Whitmire, knew of the backlog of untested SAKS, but did nothing to force or obtain funding for the testing.

65. Houston Mayor Bob Lanier (deceased), knew of the backlog of untested SAKS, but did nothing to force or obtain funding for the testing.

66. Houston Mayor Lee P. Brown, knew of the backlog of untested SAKS, but did nothing to force or obtain funding for the testing.

67. Houston Mayor Bill White, knew of the backlog of untested SAKS, but did nothing to force or obtain funding for the testing.

68. Houston Mayor Annise Parker, knew of the backlog of untested SAKS, but did nothing to force or obtain funding for the testing.

69. In 1991, the Chief of Police for the Houston Police Department, Elizabeth "Betsy" Watson, knew of the backlog of untested SAKS, but did nothing to force the testing.

70. In 1994, the Chief of Police for the Houston Police Department, Sam Nuchia, knew of the backlog of untested SAKS, but did nothing to force the testing.

71. In 2002, the Chief of Police for the Houston Police Department, Clarence Bradford, knew of the backlog of untested SAKS, but did nothing to force the testing.

72. In 2005, the Chief of Police for the Houston Police Department, Harold Hurtt, knew of the backlog of untested SAKS, but did nothing to force the testing.

22

73. In 2011, the Chief of Police for the Houston Police Department, Charles McClelland, knew of the backlog of untested SAKS, but did nothing to force the testing.

74. Unbeknownst to DeJenay Beckwith and the Putative Class Members, Houston had a policy, practice and/or custom of storing and not testing SAKS.

75. Unknown to DeJenay Beckwith and the Putative Class Members, Houston had a continuing policy, practice and/or custom of failing to submit SAKS for testing:

    a. Over six thousand (6,000) SAKS went untested over a period of several decades; and

    b. A disproportionate number of the victims whose body fluids were taken and located in the SAKS were women.

76. Unknown to DeJenay Beckwith and the Putative Class Members Houston and the Individual Defendants have continued to this very day and failed to:

    a. Properly supervise the submission of SAKS for testing

    b. Properly train its employees and personnel

    c. Properly utilize SAKS to prevent rape and sexual assaults

    d. Arrange for the timely analysis and evaluation of the evidence contained in the SAKS;

    e. Affect an arrest of the perpetuators of crimes committed against women;

    f. Determine if other crimes may have been committed by the perpetuators; and,

    e. Prevent future victimization of women and children by rape and/or sexual assaults by the perpetuators.

77.  On information and belief, the failure to submit DeJenay Beckwith's and the Putative Class Members' SAKS for testing was consistent with an institutional practice and ongoing policy of the Houston Police Department, was known to policy makers within the Houston Police Department, was ratified by multiple policymakers within the Houston Police Department, and the Defendant failed to take any effective action to prevent the personnel within the Houston Police Department from continuing to engage in such unconstitutional misconduct.

78. For at least the last thirty (30) years and up to the present time, the City has continuously carried out an ongoing unconstitutional policy, practice and/or custom of failing to submit SAKS for testing. The continuation of such practices amounts to a conspiracy to willfully violate the rights of the citizens who lived, worked or visited the City of Houston.

# X.

## PLAINTIFFS HAVE SUFFERED INJURY

79. At all times relevant hereto, DeJenay Beckwith and the Putative Class Members have been and are being continuously harmed by Houston's ongoing unconstitutional policy, practice and/or custom of failing to submit SAKS for testing. Such practices constitute a continuing uninterrupted tortious conduct by the defendants.

80. At all times, relevant hereto and on each day that passes, DeJenay Beckwith and the Putative Class Members sustain a new injury as a result of the City's ongoing unconstitutional policy, practice and/or custom of failing to submit SAKS for testing.

81. Plaintiffs have suffered extreme emotional distress and psychological damage.

# XI.

## 42 U.S.C. §1983: VIOLATIONS OF EQUAL PROTECTION AND DUE PROCESS AGAINST THE CITY OF HOUSTON

82. DeJenay Beckwith repeats, realleges, and incorporates herein each of the preceding and following paragraphs as if fully set forth herein.

83. At all relevant times herein, the Houston Police Department acted under color of law.

84. At all relevant times herein, Houston, followed an unwritten and on-going policy or custom of responding differently, and thus affording less protection, to female victims of rape and sexual assault than to victims of other crimes.

85. Houston, has a custom of failing to submit rape kits for genetic testing while it routinely submits genetic evidence for testing when the crime which is being investigated is a crime other than rape and/or sexual assault.

86. DeJenay Beckwith's and other Putative Class Members' injuries are the result of this unconstitutional municipal policy or custom.

87. Houston, acted with a discriminatory motive in pursuing this policy.

88. In addition, DeJenay Beckwith and Putative Class Members assert a claim of class-based discrimination based on sex.

89. Houston, has established a policy which provides less protection to female

26

rape victims than to other victims of assault.

90. Houston's policy is sex and gender-based and its adverse effect reflects invidious sex and gender-based discrimination.

91. Houston's policy which discriminates against victims of sexual assault adversely affects women.

92. Houston's policy has both an adverse impact and a discriminatory purpose.

93. At all relevant times herein, the Defendant with deliberate indifference, intentionally, willfully and wantonly and/or with reckless disregard deprived DeJenay Beckwith and the Putative Class Members of rights and/or privileges secured by the Constitution, including but not limited to:

    a.    Defendant deprived DeJenay Beckwith and Putative Class Members of Due Process Clause property interests in their DNA samples, which had been provided and stored at Houston, facility, and their right to redress in the courts, by failing to investigate, submit sexual evidence kits, or arrest the accused; and

    b.    Defendant deprived DeJenay Beckwith and Putative Class Members of Due Process Clause property interests in their persons, by failing to investigate, submit SAKS or arrest the accused.

27

94. Houston, with deliberate indifference, failed to train its police officers as to the rights of female victims of rape and/or sexual assault with whom the police come into contact, including but not limited to, Jane Doe and other Putative Class Members.

95. Houston's deliberate indifference, and willful and wanton conduct created a danger of an increased risk of harm of sexual abuse of females, and/or fostered an environment to exist and continue in which female victims are sexually abused and/or in fear of sexual assault.

96. Houston's deliberate indifference, and willful and wanton conduct created a danger of an increased risk of harm to female victims of sexual abuse, by failing to investigate rape and/or sexual assault crimes.

97. Houston's deliberate indifference, and willful and wanton conduct created a danger of an increased risk of harm to female victims of sexual abuse, by fostering an environment whereby the perpetrators of sexual assault were allowed to continue to prey on victims without fear of investigation by the Houston Police Department.

98. At all relevant times hereto, Houston treated DeJenay Beckwith and the Putative Class Members disparately as compared to similarly situated adult males.

99. Houston's conduct was motivated by the Putative Class Members' sex and age.

100. Houston's policies identified herein targeted females and children.

101. Houston's policies identified herein have no rational basis and do not bear a substantial relationship to an important governmental objective.

102. Houston's conduct was intentional and due to DeJenay Beckwith's and the Putative Class Members' female sex.

103. Houston has a history of discriminating against females.

104. At all relevant times hereto, the victims from whom the Houston Police Department obtained the evidence contained in the SAKS are overwhelmingly of the female sex.

105. At all relevant times hereto, the victims of crimes of assault, robbery, and homicide subject to the jurisdiction of the Houston Police Department are overwhelmingly of the male sex.

106. Houston, uses its monetary resources to investigate and process and test evidence in crimes involving assault, robbery, and homicide, but did not and does not properly use its resources to investigate and process and test evidence in crimes involving rape and sexual assault.

107. Houston, instead of using its monetary resources to test the SAKS submitted by women, chose over the years to use its monetary resources to purchase storage space/bins for the Sexual Assault Rape Kits and to simply warehouse them

29

without notice to the victims tested.

108. At all relevant times hereto, Houston, did not submit the SAKS for testing because of the victims' sex.

109. At all relevant times hereto, Houston, provided heightened police services to male victims of crime, but not to female victims of sexual assault and rape.

110. Defendant violated DeJenay Beckwith's and the Putative Class Members' civil rights by having an express policy that, when enforced, caused a constitutional deprivation to Plaintiff DeJenay Beckwith and the Putative Class Members, or by having a widespread practice and/or custom that, although not authorized by written law or express municipal policy, was so permanent and well-settled as to constitute a custom or usage with the force of law.

111. The constitutional injury inflicted by the Defendant was caused by persons with final policymaking authority for Houston.

112. Defendant knew about the herein described conduct and facilitated it, approved it, condoned it and/or turned a blind eye to it.

113. The above described conduct of Houston, constitutes a violation of 42 U.S.C. §1983.

114. DeJenay Beckwith and the Putative Class Members are entitled to

30

compensatory damages and other non-pecuniary losses.

115. As a direct and proximate result of Houston's actions, DeJenay Beckwith and the Putative Class Members suffered deprivation of their constitutional rights.

## XII.

## ACTIVE DUE PROCESS VIOLATIONS

116. DeJenay Beckwith repeats, realleges, and incorporates herein each of the preceding and following paragraphs as if fully set forth herein.

117. DeJenay Beckwith and the Putative Class Members have the fundamental right to maintain their bodily integrity and their privacy.

118. DeJenay Beckwith and the Putative Class Members have a constitutional right to control their genetic information.

119. DeJenay Beckwith and the Putative Class Members have the right to access their rape kit and to challenge its indefinite storage.

120. DeJenay Beckwith and the Putative Class Members have a constitutional right of access to the courts.

121. Houston, has a custom of deliberately and routinely (a) directing and/or mandating that victims of sexual assault submit to a search of their bodies for the collection of genetic material; (b) failing to submit completed SAKS for genetic testing; (c) failing to inform sexual assault victims that Houston, routinely fails to

submit said SAKS for genetic testing allegedly due to lack of funding; and, (d) failing to inform sexual assault victims that they may pay the cost of the genetic testing themselves in order to insure their SAKS were tested and actually processed in order to be used in an investigation.

122. Houston's executive determination and its pattern and practice of deliberately and routinely failing to submit SAKS for genetic testing does not bear any relation to a proper legislative purpose, and instead, is both arbitrary and discriminatory.

123. Houston's executive determination and its pattern and practice of deliberately and routinely ignoring valuable genetic evidence obtained after alleged sexual assaults on women does not bear any relation to a proper legislative purpose, and instead, is both arbitrary and discriminatory.

124. Houston, by deliberately and systematically failing to take affirmative action to either ensure SAKS are tested or that victims have access to untested kits, implicitly supports a deprivation of the right to privacy, and the right to control one's genetic information.

125. Houston's intentional and systematic failure to submit SAKS for genetic testing constitutes an official action which has denied DeJenay Beckwith and the Putative Class Members the opportunity to litigate and has resulted in specific cases

that cannot now be tried or tried with all material evidence, no matter what official action may be in the future.

126. As a result of Houston's deliberate failure to submit SAKS for genetic testing, critical evidence has remained unavailable to sexual assault victims.

127. As a result of Houston's deliberate acts, DeJenay Beckwith and the Putative Class Members have suffered a loss that is so far beyond the outer limits of legitimate governmental action that no amount of process could cure the deficiency.

128. The City of Houston's deliberate indifference to rape victims of sexual assault is egregious enough to violate DeJenay Beckwith's and the Putative Class Members' right to substantive due process.

129. The City of Houston's acts constitute deliberate conduct, intended to injure, that cannot be justified by any governmental interest and that violates DeJenay Beckwith's and the Putative Class Members' right to substantive due process.

**XIII.**

**VIOLATIONS OF THE FOURTH AMENDMENT**

130. DeJenay Beckwith repeats, realleges, and incorporates herein each of the preceding and following paragraphs as if fully set forth herein.

131. At all relevant times herein, Houston, acted under color of law.

132. At all relevant times herein, medical personnel who performed the SAKS testing on DeJenay Beckwith and the Putative Class Members were either government actors or acting at the direction of Houston, and thus were effectively acting as agents of the government for Fourth Amendment purposes.

133. The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State.

134. The genetic testing performed on DeJenay Beckwith and the Putative Class Members constituted a warrantless search as it was an intrusion below the bodily surface and constituted a search of DeJenay Beckwith's and Class member's person within the meaning of the Fourth Amendment.

135. DeJenay Beckwith and the Putative Class Members have both property rights and the right of privacy in their biological materials.

136. The genetic testing performed on DeJenay Beckwith and the Putative Class Members implicates the Fourth Amendment at two independent stages: (1)

34

performance of the SAKS and (2) retention of the genetic material obtained during the test.

137. DeJenay Beckwith and Putative Class Members consented to said search at the time under the reasonable belief that the search was being performed in order to obtain DNA and other evidence for the purpose of gathering physical evidence to prosecute assailants and which physical evidence would be tested as part of an investigation by Houston.

138. An objectively reasonable person in DeJenay Beckwith's and Putative Class Members' situation would have likely understood that the consent to search was for the purpose of obtaining physical evidence which would actually be tested in order to be used in an investigation.

139. DeJenay Beckwith and Putative Class Members did not give consent to the genetic testing as they had no knowledge and were not informed that Houston, deliberately and recklessly intended to ignore the genetic evidence obtained, had no intention of ever submitting the genetic materials obtained for genetic testing, had no intention to use the SAKS results in any investigation, and instead merely intended to indefinitely retain DeJenay Beckwith's and Putative Class Members' genetic information.

140. DeJenay Beckwith and Putative Class Members were unable to give

informed consent for the SAKS testing because they lacked knowledge that no investigative purpose was being served by the testing and did not understand that the test was not being conducted for the law enforcement purpose of obtaining evidence to be used in the investigation of a crime.

141. Because of Houston's intentional failure to submit DeJenay Beckwith's and Putative Class Members' SAKS for proper DNA testing, DeJenay Beckwith's and Putative Class Members' consent was not objectively reasonable and the City violated Plaintiff's and Putative Class Members' Fourth Amendment right against unreasonable search and seizure.

142. The City of Houston's indefinite retention of the genetic material obtained from DeJenay Beckwith and Putative Class Members constitutes an unreasonable continued seizure under the Fourth Amendment.

143. The City of Houston's retention of the genetic material obtained from DeJenay Beckwith and Putative Class Members with no reasonable intent to ever test the genetic material independently violates DeJenay Beckwith's and Putative Class Members' Fourth Amendment right against unreasonable search and seizure.

## XIV.

## <u>FIFTH AMENDMENT TAKINGS CLAUSE/MISUSE OF PROPERTY</u>

144. DeJenay Beckwith repeats, realleges, and incorporates herein each of the preceding and following paragraphs as if fully set forth herein.

145. By retaining and not testing SAKS collected from victims of sexual assault and rape, the City of Houston is unlawfully taking property owned by the victims in violation of the Fifth and Fourteenth Amendments.

146. DeJenay Beckwith's and Putative Class Members' genetic material in the SAKS constitutes their property.

147. Because the City of Houston has and is retaining the SAKS, DeJenay Beckwith's and Putative Class Members' genetic material contained in the SAKS constitutes a *per se* taking.

148. The City of Houston failed to effectuate the taking for any public use because it failed to test the genetic evidence and other collected materials, much less utilize it to facilitate the investigation and prosecution of the individual that committed the sexual assault.

149. Accordingly, taking DeJenay Beckwith's and Putative Class Members' genetic evidence and leaving it untested is not rationally related to the governmental or statutory purpose of collecting such evidence, because if untested, the kits do not

provide evidence of a sexual offense, do not aid in the investigation of a crime, or facilitate the prosecution of the individuals that committed a sexual assault.

## XV.

## <u>NEGLIGENCE</u>

150. DeJenay Beckwith repeats, realleges, and incorporates herein each of the preceding and following paragraphs as if fully set forth herein.

151. When the Houston, through its agents, voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member, thereby inducing reliance, it is held to the same standard of care as a private person or organization.

152. Breach of duty may be an affirmative act which places the person in peril or increases the risk of harm, or may constitute an omission or failure to act.

153. Houston is liable when investigating police officers fail to investigate properly or fail to investigate at all, and when the police induce reliance on a promise, express or implied, that they will provide assistance, but do not do so.

154. Houston, assumed the responsibility of properly investigating the sexual assault perpetrated on DeJenay Beckwith and Putative Class Members by inducing DeJenay Beckwith and Putative Class Members into submitting to the physical examination required by SAKS.

155. Houston contributed to, increased, and changed the risk which would have otherwise existed to DeJenay Beckwith and Putative Class Members by inducing DeJenay Beckwith and Putative Class Members into submitting to the physical examination required by SAKS testing, and then taking possession of the genetic evidence obtained and retaining said evidence indefinitely without any testing whatsoever or otherwise using it in any investigation.

156. Had DeJenay Beckwith and Putative Class Members not relied upon the Houston to properly submit the evidence obtained from the SAKS for testing and to use the genetic material obtained for an investigation, DeJenay Beckwith and Putative Class Members could have had genetic testing performed themselves.

157. DeJenay Beckwith's and Putative Class Members' detrimental reliance on the Houston, the Houston's voluntary assumption of the responsibility to submit the genetic evidence for proper testing, and the Houston's conduct and statements induced a false sense of security and thereby worsened Plaintiff's position and violated the Houston's duty owed to DeJenay Beckwith and Putative Class Members.

158. On information and belief, Houston, authorized, tolerated as an ongoing institutional practice and ratified the misconduct of the Houston Police Department by:

39

     a.    Failing to properly supervise the Houston Police Department;

     b.    Failing to properly train the Houston Police Department;

     c.    Failing to forward to the District Attorney of Harris County, Texas, evidence of criminal acts committed in Harris County;

     d.    Failing to protect and ensure evidence was not discarded;

     e.    Failing to protect and ensure evidence was not lost or mishandled; and,

     f.    Failing to discipline, restrict and control Houston Police Department employees for failing to investigate crimes of sexual assault against females.

159. DeJenay Beckwith and the Putative Class Members suffered ongoing injuries, including but not limited to:

     a.  A deprivation of their property,

     b.  A deprivation of their right to privacy, and

     c.  Emotional distress.

## XVI.

## TOLLING OF LIMITATIONS

160. DeJenay Beckwith repeats, realleges, and incorporates herein each of the preceding and following paragraphs as if fully set forth herein.

161. All of the above causes of action, and each of them, have the statutes of

40

limitations tolled by the fraudulent concealment of the facts relating to the backlog of SAKS testing. The Defendants knew of the facts and remained silent when they had a duty to speak to the public they served. Further, in many cases the Defendants actively made misrepresentations that concealed the lack of SAKS testing. The Defendants had a fixed purpose to conceal the failures, such as political expediency as well as the discriminatory intent as set out above. The Plaintiffs relied upon this concealment and experienced damage as a result and relied upon the concealment.

162. The Plaintiffs' claims further have been tolled by the discovery rule. The fact of lack of testing was inherently undiscoverable to the Plaintiffs and to the public at large; these were police, forensic and City of Houston matters held private. The matters themselves were objectively verifiable, but the failure to provide information such that the Plaintiffs could know of the event sand the injury means that limitations were tolled until such time as the Plaintiffs knew or using reasonable diligence could have known of the facts giving rise to the above claims.

163. As to minor Plaintiffs, statutes of limitations are tolled for each and every minor defendant due to their minority.

# XVII.

## JURY TRIAL REQUESTED

164. Plaintiffs request trial by jury.

# XVIII.

## DAMAGES AND RELIEF REQUESTED

165. DeJenay Beckwith and Putative Class Members adopt by reference and reallege each and every allegation of all paragraphs of all counts of this Complaint the same as though specifically set out herein again.

166. DeJenay Beckwith and Putative Class Members seek the following:

a.  Judgment finding Defendants jointly and severally liable for monetary damages;

b.  Judgment awarding Plaintiff and all those joined the costs of this action;

c.  Judgment awarding Plaintiff and all those joined their attorneys' fees;

d.  Judgment awarding Plaintiff and all those joined pre- and post-judgment interest as allowed by law; and,

e.  All relief, in law or in equity, to which Plaintiff and all those joined show themselves entitled.

## XIX.

## <u>INJUNCTIVE RELIEF</u>

167. Plaintiffs incorporate all of the paragraphs above as though fully stated herein.

168. Plaintiffs pray for and are entitled to Injunctive relief mandating that Houston meaningfully investigate rape cases involving female victims and expeditiously test all facts in their possession in an organized transparent process supervised by this court pursuant to its continuing jurisdiction.

169. Because plaintiffs are women and children, they are at risk of the Defendants ignoring and failing to investigate rapes in a manner which would serve to prevent rapes by perpetrators who have committed this or other crimes in the past.

170. Without the intervention of this Court, plaintiffs cannot prevent the City of Houston from continuing its violation of equal protection of the law.

171. Plaintiffs seek injustice and equitable relief which would require the Defendants to establish and enforce policies and procedures that ensure the timely testing of facts and the prosecution of rape and sexual assault cases on an equal basis and with the same priorities given to the investigation of other crimes.

172. These policies and procedures should address the thoroughness of such investigations and require timely investigation, consistent communication with rape

victims, the coordination of investigation with other stakeholders in the criminal justice system.

173. The plaintiffs request that the court appoint a monitor or Special Master to ensure that required changes are reviewed, approved and implemented.

174. Plaintiff so prays.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

Respectfully submitted,

*/s/ Randall L. Kallinen*
Randall L. Kallinen
TBN: 00790995
FBN: 19417
attorneykallinen@aol.com

KALLINEN LAW PLLC
511 Broadway Street
Houston, Texas 77012
(713) 320-3785

*/s/ Charles H. Peckham*                    */s/ Roy J. Rodney, Jr*
Charles H. Peckham                          Roy J. Rodney, Jr.
TBN: 15704900                               TBN:  24082489
FBN: 15770
cpeckham@pmlaw-us.com                        RODNEY & ETTER, LLC
                                            800 Bering Dr., Suite 220
Mary A. Martin                              Houston, TX  77057
TBN:  00797280                              (713) 936-2829
FBN:  12272                                 (713) 936-2812 - facsimile
mmartin@pmlaw-us.com                         rjr@rodneylaw.com

PECKHAM MARTIN, PLLC
Two Bering Park
800 Bering Drive, Suite 220
Houston, Texas 77057
(713) 574-9044
(713) 493-2255 – facsimile

                                   **COUNSEL FOR PLAINTIFFS**